## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| TAYAH LACKIE, | Civil File No. 24-cv-01684 (LMP/LIB) |
| Plaintiff, | |
| vs. | **MINNESOTA STATE UNIVERSITY STUDENT ASSOCIATION, INC. D/B/A STUDENTS UNITED'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT** |
| MINNESOTA STATE UNIVERSITY STUDENT ASSOCIATION, INC. d/b/a STUDENTS UNITED; ST. CLOUD STATE UNIVERSITY; GEORGE SOULE, in his official capacity as Chair of the Minnesota State Colleges and Universities Board of Trustees; DAWN ERLANDSON, in her official capacity as Vice Chair of the Minnesota State Colleges and Universities Board of Trustees; JAY COWLES, JIM GRABOWSKA, TIM HUEBSCH, JERRY JANEZICH, JACQUELINE JOHNSON, JANA JOHNSON, ROGER MOE, JAVIER MORILLO, CHRISTOPHER RICHTER, KATHY SHERAN, and CHERYL TEFER, in their official capacities as Members of the Minnesota State Colleges and Universities Board of Trustees; SCOTT OLSON, in his official capacity as Chancellor of the Minnesota State Colleges and Universities; ROBBYN R. WACKER, in her personal and official capacity as President of ST. CLOUD STATE UNIVERSITY, or her successor; and LARRY LEE, in his personal and official capacity as Vice President for Finance and Administration at ST. CLOUD STATE UNIVERSITY, or his successor, | |
| Defendants. | |

Minnesota State University Student Association, Inc. d/b/a Students United

(hereafter "Students United") submits this Memorandum of Law in support of its Motion to Dismiss Plaintiff Tayah Lackie's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## PROCEDURAL BACKGROUND

On May 9, 2024, Plaintiff Tayah Lackie (hereafter "Lackie"), then a former student of St. Cloud State University, commenced this lawsuit against Students United, St. Cloud State University, Robbyn R. Wacker, and Larry Lee (hereafter collectively "SCSU"). *See* Complaint [Doc. 1]. In the Complaint, Lackie asserted three counts: 1) that Students United and SCSU violated her First Amendment rights by requiring her to pay fees to Students United as a condition of her enrollment at SCSU (*Id*. at ¶¶51-58); 2) that Students United and SCSU violated her First Amendment rights by requiring her to be a member of Students United as a condition of her enrollment at SCSU (*Id*. at ¶¶59-65); and 3) unjust enrichment against Students United for the fees she paid and it received (*Id*. at ¶¶66-71). Lackie requested a declaratory judgment that her First Amendment rights were violated, damages in the amount of fees she was required to pay, an award of nominal damages and damages for dignitary harm, an award of damages based on her unjust enrichment claim, and attorneys' fees and costs. *Id*. at ¶¶58, 65, 71, and Prayer for Relief.

Both Students United and SCSU filed Motions to Dismiss the Complaint. At the motion hearing, United States District Judge Jerry W. Blackwell expressed the need to address the issue of standing, and an Order on Motions to Dismiss was issued on September 26, 2024, denying the Motions to Dismiss without prejudice. *See* Order on Motions to Dismiss [Doc. 31]. The Court ordered the parties to conduct limited discovery on specific

issues related to standing, and to then submit briefs addressing standing. *Id*. at p. 3.  The

Order provided that once the Court made a determination on whether Lackie had standing,

and if standing was established, Students United and SCSU would have fourteen days from

the Court's ruling to refile their Motions to Dismiss, addressing the merits of their

arguments in light of the standing determination. *Id*. at p. 4.

As ordered, the parties exchanged limited discovery and submitted briefs on

standing; and the Court, in turn, issued an Order on Plaintiff's Standing on February 6,

2025. *See* Order on Plaintiff's Standing [Doc. 42].  The Court held that Lackie had standing

to proceed with her lawsuit, but it was limited to certain claims against certain defendants.

*Id*. at p. 6.

Specifically, the Court found that because Lackie is no longer a student at SCSU,

she lacked standing to seek retrospective declaratory relief and, therefore, dismissed her

request for declaratory relief with prejudice. *Id*. at pp. 6-8.  The Court, however, found that

Lackie has standing to seek monetary damages from Students United and SCSU[1] under

Count I (fees) as well as standing to bring the unjust enrichment claim against Students

United under Count III.  *Id*. at p. 6.  But the Court found Lackie did not have standing to

bring a claim against either Students United or SCSU under Count II (membership) and,

therefore, dismissed Count II without prejudice.  *Id*.

In accordance with the Order on Motions to Dismiss, Students United then filed a

---

[1] The Court, however, found that neither of SCSU's administrators were involved in collecting fees or determining membership and, therefore, dismissed Wacker and Lee for lack of standing.

renewed Motion to Dismiss the Complaint.  *See* Renewed Motion [Doc. 51-54].  Around the same time, Lackie, through counsel, advised of her intent to seek to amend the complaint to add the Board of Trustees of the Minnesota State Colleges and Universities (hereafter "Board") and Chancellor of the Minnesota State Colleges and Universities (hereafter "Chancellor") as parties.[2]  The Court, without requiring a motion to amend, granted Lackie leave to amend the Complaint, dismissed the renewed motions to dismiss as moot, and established a briefing schedule for any motions seeking dismissal of the Amended Complaint.  *See* Order Granting Leave [Doc. 55].  Lackie, in turn, filed an Amended Complaint on March 5, 2025, which generally adds the Chancellor and Board members as parties.  *See* Am. Complaint [Doc. 57].

Now, in accordance with the Order establishing a briefing schedule, Students United brings a Motion to Dismiss the Amended Complaint.  Specifically, Students United seeks dismissal of Count I (fees) and Count III (unjust enrichment).  Lackie's request for declaratory relief and Count II (membership) have already been dismissed as to Students United by the Order on Plaintiff's Standing.  *See* Order on Plaintiff's Standing [Doc. 42].

## FACTS

By statute, the Board possesses "all powers necessary to govern the state colleges and universities," which includes the need to "set tuition and fees" and "adopt suitable

---

[2] Students United advised that it did not take a position on Lackie's request to amend the Complaint as the redlined changes set forth in the draft Amended Complaint provided by her counsel did not fundamentally change anything with regard to Students United.  *See* Letter [Doc. 46].  It is noted that the Amended Complaint filed by Lackie differs from the redlined version that was provided to counsel.

policies for the institutions it governs," including SCSU.  Minn. Stat. § 136F.06, subd. 1; and Minn. Stat. § 136F.10.  *See also* Minn. Stat. § 136F.70, subd. 2 (providing the Board "may prescribe fees to be charged students for student unions, state college and university activities, functions, and purposes").

Among the Board's policies is Board Policy 2.1, which provides that "[s]tudents at each college and university have the right to establish a student government herein referred to as a campus student association."  Minn. State Bd. Policy 2.1(1).  The college or university, in turn, must recognize the campus student association as the official representative of students.  *Id*.

By statute, the Board must also "recognize one statewide student association for the state universities . . ."  Minn. Stat. § 136F.22, subd. 1.[3]  The statute requires that "[e]ach campus student association shall be affiliated with its statewide student association and all students enrolled on those campuses shall be members of their respective statewide association."  *Id*.  The statute further provides that:

> Each statewide association shall set its fees to be collected by the board and shall submit any changes in its fees to the board for review.  The board may revise or reject the fee change.  Fees must be collected by each state college and university and shall be credited to each association's account to be spent as determined by that association.

Minn. Stat. § 136F.22, subd. 2.  *See also* Minn. State Bd. Policy 5.11(5) (listing the statewide student association fee among the "five required fees," which all colleges and

---

[3] The Board is likewise to recognize one statewide association for community and technical colleges.

universities are required to charge per Minnesota statues, board policies, and system procedures). Lackie alleges that the Board's policy mandating the collection of fees is implemented by the Chancellor and enforced by SCSU. *See* Am. Complaint, ¶¶3, 9, 29 [Doc. 57].

Per Board Policy 3.7, adopted and implemented in 1994, the Board recognized Students United as the one statewide student association for state universities. *See* Minn. State Bd. Policy 3.7(1). The Board Policy reaffirms the association, enrollment, and fee requirements set forth in Minn. Stat. § 136F.22 and notes that "[f]ees must be forwarded by the college or university to the statewide student association whether or not the college or university has received payment for fees." Minn. Stat. Bd. Policy 3.7(1) and (3).[4]

Students United is a private, independent, non-profit organization established in 1967, which describes itself as "the inclusive voice for all future, current, and former students" that works to "represent and support Minnesota State University students and advocate at a local, system, state, and federal level of higher education policies that make a positive impact for our students and communities."[5]

Students United is governed by a Board of Directors, which is comprised of seven

---

[4] The policy also provides that recognition of the statewide association "must continue until such recognition is repealed by the board and succeeded by an appropriately constituted association representing the same groups of students." Minn. State Bd. Policy 3.7(4). Repeal of the Board's recognition must occur if two-thirds of the existing statewide student association vote no confidence, or two-thirds of the campus student associations submit a petition to the Board indicating no confidence. *Id.*

[5] See https://www.studentsunited.org/about

voting members, generally the student body presidents of the Minnesota State universities, and three non-voting officers, all of whom are also students. *Id*. The Board of Directors, in turn, hires some non-student staff to help execute the Board of Directors' vision and agenda. *Id*. Students United operates pursuant to its own governing documents, which includes a Student Platform, Bylaws, Policies and Procedures, and Financial Policies.[6]

According to the Amended Complaint, Lackie attended SCSU from the Fall of 2021, while she was still a high school student, through graduation on May 3, 2024. *See* Am. Complaint, ¶¶12, 51-53 [Doc. 57]. Lackie alleges that shortly before graduating, she learned that she had been required to pay fees to Student United in addition to her tuition for the 2023-2024 academic year, which totaled $21.60 (or $0.80 per credit) per her itemized school account statements. *Id*.at ¶¶31, 55.[7]

Lackie asserts that she was unaware of Students United or any of its activities. *Id*. at ¶57. Lackie, however, asserts that she disagrees with certain positions advocated by Students United, including its advocacy for the abolition of student debt. *Id.* at ¶61. Lackie therefore objects to being forced to pay for any political speech by Students United and to being forced to be a member of Students United as a condition of attending SCSU. *Id*. at ¶¶61, 64. She contends that but for the Board's recognition of Students United and policy forcing her to be a paying member, the Chancellor's implementation of that policy, and

---

[6] See https://www.studentsunited.org/governing-documents

[7] As the Amended Complaint acknowledges, the per credit rate charged to students at SCSU for Students United is set forth on the university's website. *See* https://www.stcloudstate.edu/businessservices/student-services/cost-of-attendance.aspx

SCSU's enforcement of that policy, she would not have joined or paid any money to Students United. *Id*. at ¶64.

## LAW AND ARGUMENT

### I.    Legal Standard for Dismissal Under Fed. R. Civ. P. 12(b)(6).

Under Fed. R. Civ. P. 12(b)(6), a defendant may move for dismissal of a lawsuit for failure to state a claim upon which relief may be granted. Dismissal under this rule "serves to eliminate actions which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Wells v. Schnick*, 2008 WL 4110697, at *3 (D. Minn. 2008) (citing *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on it face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 556 U.S. 662, 678 (2009). The factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In assessing the sufficiency of the complaint, the Court need not consider legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-79. The Court, however, must accept as true all factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012).

While the presentation of matters outside the pleadings generally will require a

motion to dismiss to be treated as a motion for summary judgment, the Court may consider materials that are part of the public record, necessarily embraced by the complaint, and any exhibits attached to the complaint without converting it into a summary judgment motion. *See e.g. Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017); and *Wells*, 2008 WL 4110697, at *3 (citations omitted).[8]

## II.    The First Amendment Claim Related to Fees (Count I) Fails As To Students United Because Students United Is A Private Entity, Not A State Actor.

The First Amendment's protections govern only state or government actions, not private actions or entities. *See e.g., Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019); *Wickersham v. City of Columbia*, 481 F.3d 591, 697 (8th Cir. 2007). In certain circumstances, however, the government may become so entangled in private conduct that "the deed of an ostensibly private organization or individual is treated . . . as if a State has caused it to be performed." *Wickersham*, 481 F.3d at 597 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001)). To ascertain whether there is state action, the Court must determine "whether the conduct at issue is 'fairly attributable' to the state." *Id.* (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982)).

The "fair attribution" inquiry requires consideration of two questions: 1) whether the claimed deprivation was "caused by the exercise of some right or privilege created by

---

[8] While the parties have exchanged limited discovery as previously ordered by the Court, Students United has limited the facts set forth in this Memorandum to allegations set forth in the Amended Complaint, materials that are part of the public record, or items embraced by the Amended Complaint.

the State or by a rule of conduct imposed by the state or by a person for whom the state is responsible;" and 2) whether the party charged with the deprivation is "a person who may fairly be said to be a state actor." *Lugar*, 457 U.S. at 937, 940 (also stating the questions as "whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority" and "whether, under the facts of [the] case, [defendant], who [is a] private part[y], may be appropriately characterized as [a] 'state actor[ ]'"). The second inquiry must be satisfied because "[w]ithout a limitation such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Id*.

Lackie acknowledges that Students United is a private entity, yet she fails to allege any basis upon which Student's United can be determined to be a state actor for purposes of the First Amendment. *See* Am Complaint, ¶1. The Amended Complaint alleges that "Students United exercises a right or privilege having its source in state authority when it collects mandatory fees from [SCSU] and students such as Plaintiff." Am. Complaint, ¶32. While that allegation seemingly is sufficient to satisfy the first part of the state actor analysis, "[a]ction by a private party pursuant to [a] statute without something more, [is] not sufficient to justify a characterization of that party as a 'state actor.'" *Lugar*, 457 U.S. at 939. Lackie fails to assert the "something more."

The Supreme Court has found that a private entity can qualify as a state actor in a few limited circumstances, including: 1) when the private entity performs a traditional, exclusive public function; 2) when the government compels the private entity to take a particular action; or 3) when the government acts jointly with the private entity. *See*

10

*Manhattan Comm. Access Corp.*, 587 U.S. at 809.  Ultimately, however, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy*, 531 U.S. 295 (quoting *Jackson v. Metropolitan Edison Co*., 419 U.S. 345, 351 (1974)).  And "[n]o such nexus exists where a private party acts with the mere approval or acquiescence of the state."  *Wickersham*, 481 F.3d at 597 (citing *Blum v. Yaretsky*, 457 U.S. 1991, 1004-05 (1982)).

Lackie, with the benefit of having the shortcomings of her Complaint pointed out in Student's United's Motion to Dismiss and Renewed Motion to Dismiss, now alleges that all Defendants acted jointly to take dues from her.  *See* Am. Complaint, ¶72 [Doc. 57].  Such activity, however, is all based on rights or obligations created by statute; and the Amended Complaint still fails to assert a "close nexus" between Students United and the alleged deprivation.

As the Court noted in its Order on Plaintiff's Standing, the action giving rise to Lackie's First Amendment fees claim is the mandatory collection of fees.  *See* Order, p. 13-14 [Doc. 42].  While the Court further recognized that Students United has some involvement with the fees, specifically, it sets the fee amount which are then collected by SCSU and provided to Students United, Lackie's claim is <u>not</u> based on the amount of fees assessed, which were nominal, but her issue is with the fact that any fees were collected. *Id*. at pp. 10-11.  Students United's setting of the fees, however, and its ultimate receipt of the fees were pursuant to statute which, again, may satisfy the first state actor question, but does not satisfy the second and equally necessary state actor prong.

While the Court found that Students United's role in setting and receiving fees collected by SCSU provided "some connection" with the fee process for purposes of standing, something more than "some connection" or some involvement with a government entity is required before Students United can be treated as a state actor for purposes of the First Amendment. *Id.* at p. 14. Otherwise, nearly every entity interacting with a university (or government entity) would be at risk of being a state actor and restrained by the First Amendment.

If, for example, SCSU selected a private company to make athletic uniforms for the school, collected the cost for such uniforms from all student athletes, and then paid that money to the private company, under Lackie's analysis, that private company would qualify as a state actor simply because SCSU was involved in collecting and paying money to the company. If the company then used some of its revenue to fund political speech, Lackie seemingly would argue that the private company violated the student athlete's rights. But certainly, not every private individual or entity that interacts with or receives money from a state or government actor, including pursuant to a statute, can be considered a state actor based on nothing more.

Lackie's First Amendment fees claim ultimately is based on the allegation that she was required to subsidize Students United, the statewide student association recognized by the Board, and its political speech. *See* Am. Complaint, ¶68 ("Defendants required Plaintiff . . . to . . . subsidize Students United's political speech by charging and collecting mandatory fees") and ¶69 ("[t]he mandatory fees compelled Plaintiff to . . . subsidize Students United's speech with which she disagreed . . ."). Such claims, however, are not enough to fairly

characterize Students United as a state actor.

As discussed in *Manhattan Comm. Access Corp.*, 587 U.S. at 805-06, the Cable Communications Policy Act of 1984 authorized state and local governments to require cable operators to set aside channels on their cable systems for public access. The New York State Public Service Commission regulated cable franchising in New York, and it required cable operators, such as Time Warner, to set aside channels for public access. *Id.* at 806. New York City, in turn, designated a private, non-profit corporation, Manhattan Neighborhood Network (MNN), to operate Time Warner's public access channels in Manhattan. *Id*.

Halleck and Melendez produced public access programming in Manhattan, which included a film about MNN's alleged neglect of the East Harlem community. *Id*. Although MNN aired the film, after it received several complaints about it, MNN first temporarily suspended Halleck from using the public access channels; and then after another dispute with MNN, suspended Halleck and Melendez from all MNN services and facilities. *Id*. at 806-07. The producers sued MNN alleging their First Amendment free speech rights were violated when MNN restricted their access to the public access channels because of the content of their film. *Id*. at 807.

MNN moved to dismiss the First Amendment claim on the basis that it was not a state actor. *Id*. In response, the producers argued, in part, that MNN was a state actor because New York City designated MNN to operate the public access channels on Time Warner's cable system, and New York State heavily regulated MNN with respect to the public access channels. *Id*. at 814. The Supreme Court, however, rejected this argument,

explaining that:

> New York City's designation of MNN to operate the public access channels is analogous to a government license, a government contract, or a government-related monopoly. But as the Court has long held, the fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor – unless the private entity is performing a traditional exclusive public function. . . The same principle applies if the government funds or subsidizes a private entity.

> Numerous private entities in America obtain government licenses, government contracts, or government-granted monopolies. If those facts sufficed to transform a private entity into a state actor, a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities. As this Court's many state-action cases amply demonstrate, that is not the law. Here, therefore, the City's designation of MNN to operate the public access channels on Time Warner's cable system does not make MNN a state actor.

*Id*. at 814-15 (internal citations omitted).

Likewise, the Board's recognition of Students United as the one statewide student association for state colleges and universities and the subsidization of Students United, not directly through state funds, but through mandatory student fees, does not make Students United a state actor. Nor is there anywhere close to the same level of entwinement between the government and Students United as in *Brentwood Academy*, a case involving a statewide athletic association which was found to be engaging in state action.

At issue in *Brentwood Academy* was Tennessee Secondary School Athletic Association ("Association"), a non-profit membership corporation organized and designated to regulate interscholastic sport among public and private high schools in Tennessee. *See Brentwood Academy*, 531 U.S. at 291-92. Although no school was forced to join, without any other authority regulating interscholastic athletics, almost all of the

state's public high schools were members; in fact, 84% of the Association's voting

members were public schools and just 16% private schools. *Id*. at 291.

The Association had a legislative council and board, the voting members of which

were limited to high school principals, assistant principals, superintendents, and public

school administrators. *Id*. Although member schools paid dues to the Association, the bulk

of its revenue came from gate receipts from member sporting events. *Id*. The Association

had a constitution, bylaws, and rules; however, the State Board of Education reviewed and

approved the Association's rules and regulations, including the recruiting rule at issue in

the case. *Id*. at 291-92.

The Supreme Court found that "[t]he nominally private character of the Association

is overborne by the pervasive entwinement of public institutions and public officials in its

composition and workings, and there is no substantial reason to claim unfairness in

applying constitutional standards to it." *Id*. at 298. In reaching this decision, the Supreme

Court considered that:

> The Association is not an organization of natural persons acting on their own,
> but of schools, and of public schools to the extent of 84% of the total. Under
> the Association's bylaws, each member school is represented by its principal
> or a faculty member, who has a vote in selecting members of the governing
> legislative council and board of control from eligible principals, assistant
> principals, and superintendents.
>
> Although the findings and prior opinions in this case include no express
> conclusion of law that public school officials act within the scope of their
> duties when they represent their institutions, no other view would be rational
> . . .
>
> . . . The mechanism is an organization overwhelmingly composed of public
> school officials who select representatives (all of them public officials at the
> time in question here), who in turn adopt and enforce the rules that make the

system work. . . . and that public schools have largely provided for the Association's financial support. A small portion of the Association's revenue comes from membership dues paid by the schools, and the principal part from gate receipts at tournaments among the member schools. Unlike mere public buyers of contract services, whose payments for services rendered do not convert the service providers into public sectors . . . the schools here obtain membership in the service organization and give up sources of their own income to their collective association . . . . the Association does not receive this money from the schools, but enjoys the schools' moneymaking capacity as its own.

* * *

To complement the entwinement of public school officials with the Association from the bottom up, the State of Tennessee has provided for entwinement from the top down. State Board members are assigned ex officio to serve as members of the board of control and legislative council . . . .

*Id*. at 298-300. *See also McGee v. Virginia High School League, Inc*., 2011 WL 4501035 at *2 (noting that because statewide athletic associations are almost entirely comprised of and governed by government entities and representatives, the Supreme Court deemed them to be state actors in *Brentwood Academy*).

When such government involvement is not present, however, courts considering *Brentwood Academy* have found a private entity to not be a state actor. In *Logiodice v. Trustees of Main Central Institute*, 296 F.3d 22, 24 (5th Cir. 2002), the local government agency responsible for schooling children in certain Maine communities did not operate its own public high school and, instead, contracted with Maine Central Institute ("MCI"), a privately operated high school in the district. By contract, MCI agreed to accept and educate all students in the district in high school grades in exchange for tuition payments by the school district. *Id*. at 24-25. A question arose as to whether MCI was required to comply with state law with regard to its discipline of a student. *Id*. at 25.

16

The Fifth Circuit considered *Brentwood Academy* and noted that there were certainly connections between the state, school district, and MCI, including that the state regulated the school in various aspects, most of MCI's students were sponsored by the school district, and the school district contributed about half of MCI's budget. *Id.* at 27-28. The court, however, found the association at issue in *Brentwood Academy* distinguishable from MCI, including because MCI was run by private trustees and not public officials, and it ultimately found MCI was not a state actor. *Id.* at 28.

Likewise, in *Robertson v. Red Rock Canyon School*, LLC, 2006 WL 3041469, at ** 1, 5 (D. Utah Oct. 24, 2006), the court found that the plaintiffs' allegations were insufficient to establish state action against a private, specialized boarding school for at-risk youth. The court noted that the only assertion in the complaint regarding state action was that the school received significant amounts of government money to sustain its operation, but the plaintiffs failed to allege that Red Rock "was managed by an entity or individual directly associated with a government entity." *Id.* at **3, 5.

Here, while Students United is a statewide association, unlike in *Brentwood Academy*, Students United is a private entity comprised entirely of private individuals; specifically, student members. Students United is not governed by any government entity or actors. Instead, Students United is governed by its Board of Directors and Officers, all of whom are students, not public officials. And Students United operates pursuant to its own bylaws, policies and procedures, which are not subject to review or approval by the Board or state. Although Students United receives a large portion of its funding through student fees, which are mandated by statute, the fees are not funds that would otherwise be

paid to the colleges or universities, nor does the Board or state dictate how such fees are to be used. By statute, such fees are to be spent as determined by the recognized statewide association.

In short, Lackie has not alleged that Students United is a state actor, nor plead facts necessary to satisfy that part of the state actor analysis. That the Board recognized Students United as the one statewide student association for state colleges and universities, and Minnesota law requires student fees to be collected and paid to it, is simply not enough of an entwinement or close nexus between government and Students United so as to fairly apply constitutional standards to what is undisputedly a private entity.

## III.    The Unjust Enrichment Claim Against Students United (Count III) Fails As The Fees It Received Were Legally Justified.

Lackie also alleges that it would be unjust for Students United to retain the fees she paid. First, Lackie's unjust enrichment claim is dependent on her First Amendment claim. Accordingly, if she cannot maintain the First Amendment fees claim, including for the reasons argued, then she also cannot maintain the unjust enrichment claim. *See Platt v. Brown*, 872 F.3d 848, 853 (7th Cir. 2017) ("if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, the unjust enrichment will stand or fall with the related claim"); *Lighthouse Mngt. Group, Inc. v. Deutsche Bank Trust Co. of Americas*, 380 F.Supp.3d 911, (D. Minn. 2019) (noting the plaintiff's unjust enrichment claim was inextricably intertwined with its quiet-title claim).

Second, Lackie's contention that allowing Students United to retain the nominal fees

it received would be inequitable is insufficient to maintain an unjust enrichment claim or to entitle her to the relief requested. Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable. *See Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). *See also ServiceMaster of St. Cloud v. GAB Business Servs*., 544 N.W.2d 302, 306 (Minn. 1996) (explaining that, "[t]o establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant 'in equity and good conscience' should pay"). It is not enough that one party benefits from the efforts or obligations of others but, rather, it must be shown that a party was unjustly enriched in a manner that is illegal or unlawful. *Id*. (citing *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981)).

While Lackie contends that the collection of fees was unlawful because it violated her First Amendment rights, even if she prevails as to the First Amendment claim, that does not mean Lackie will be entitled to reimbursement of the fees she paid to Students United. In the *Janus* cases, upon which Lackie so heavily relies, the Supreme Court held that compulsory fair-share fees paid by non-members to unions violated the non-members' First Amendment. *See Janus v. AFSCE*, 942 F.3d 352, 354 (7th Cir. 2019) (discussing *Janus v. AFSCME*, 585 U.S. 878 (2018)). After that decision, Janus returned to the district court seeking a refund from the union for the fees it had paid. *Id*. at 354, 358. The district court, however, found that Janus was not entitled to a refund or any monetary damages, and the Seventh Circuit agreed. *Id*. at 359, 367.

The district court recognized that private defendants can in some circumstances act "under color of state law" for purposes of a claim brought under § 1983, and that such defendants are not entitled to immunity defenses available to public defendants, but the district court also noted that the Supreme Court had indicated private defendants may be entitled to an affirmative defense based on good faith or probable cause. *Id.* at 358 (citing *Wyatt v. Cole*, 504 U.S. 158, 169 (1992)). Thus, the key question for the district court was "whether the defendant's reliance on an existing law was in good faith" and "[g]iven the fact that 'the statute on which defendant relied had been considered constitutional for 41 years,' it found good faith" and held Janus was not entitled to damage. *Id.* at 359.

The Seventh Circuit court proceeded to formally recognize that a private party that acts under color of law for purposes of § 1983 may defend on the ground that it proceeded in good faith. *Id.* at 364. It then found that AFSCME was entitled to such a defense, noting that until the Supreme Court said otherwise, "AFSCME had a legal right to receive and spend fair-share fees collected from nonmembers as long as it complied with state law [and the related case law]" and, therefore, "[i]t did not demonstrate bad faith when if followed these rules." *Id.* at 366. (also noting that "[t]he Rule of Law requires that parties abide by, and be able to rely on, what the law *is*, rather than what the readers of tealeaves predict that it might be in the future"). *See also Brown v. AFSCMC, Council No. 5*, 519 F.Supp.3d 512, 515 (D. Minn. 2021) (finding private actors who act in good faith have an affirmative defense to § 1983 liability); *Hoekman v. Education Minnesota*, 519 F.Supp.3d 497 (D. Minn. 2021) (same).

Turning to whether Janus was entitled to monetary damages, the Seventh Circuit noted that no one disputed Janus was entitled to declaratory and injunctive relief, such that he was protected from having to pay any further fees. *Janus*, 942 F.3d at 366. The appellate court, however, agreed that AFSCME's good faith defense precluded it from having to pay monetary damages. *Id*. at 366-67.

The court recognized Janus' contention that he did not want any of the benefits of AFSCME's activities, but he received them. Thus, "there was no unjust 'windfall' to the union." *Id*. at 367. That is, despite the Supreme Court's decision that his First Amendment rights were violated, including by having to subsidize certain speech through the fair-share fees, the court concluded that Janus "has received all that he is entitled to: declaratory and injunctive relieve, and a future free of any association with a public union." *Id*.

Here, Lackie seemingly is aware of the above decisions and, therefore, attempts to circumvent them by asserting an unjust enrichment claim instead. The district court and appellate court's reasoning, nevertheless, provides guidance when considering the unjust enrichment claim. That is, until this Court (or any appellate court) determines otherwise, Students United had a legal right to receive fees under the applicable statute, and while Lackie may not have wanted the benefits of being a member of Students United, she was entitled to them. Thus, there was no "unjust" windfall to Students United, nor was its receipt of fees unlawful at the time. As in *Janus*, Plaintiff may prevail on her First Amendment claims, but she is not entitled to a refund of fees that were received by Students United in accordance with a statute, which Plaintiff does not even challenge the validity

thereof.  Students United, quite simply, did not receive fees in a manner that was illegal, unlawful, or legally unjustifiable.

## **CONCLUSION**

Because there is no plausible basis upon which Lackie can be awarded the relief she seeks, the First Amendment and unjust enrichment claims asserted against Students United should be dismissed.

Respectfully submitted,

**COUSINEAU MALONE, P.A.**

Dated: March 27, 2025                By:    /s/  Tamara L. Novotny
                                                 **Tamara L. Novotny**  #029617X
                                                 Attorneys for Minnesota State University
                                                 Student Association, Inc. d/b/a Students United
                                                 12800 Whitewater Drive, Suite 200
                                                 Minnetonka, MN 55343
                                                 952-546-8400
                                                 tnovotny@cousineaulaw.com

4905-6746-5263, v. 1